IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| STEVE VAN HORNE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 1:23-CV-00240-H-BU |
| HARRIETT L. HAAG, *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
OF THE UNITED STATES MAGISTRATE JUDGE**

Like his other lawsuits in this District,[1] Plaintiff Steve Van Horne brings this action alleging that his rights have been violated because of state-court proceedings related to his refusal to obtain a driver's license and automotive insurance. Van Horne sought leave to proceed *in forma pauperis* (IFP), which the Court granted. Dkt. No. 6. Upon further consideration and for the reasons explained below, the undersigned now recommends that the Court revoke Van Horne's IFP status and dismiss his claims under 28 U.S.C. § 1915(e)(2)(A), or § 1915(e)(2)(B).

## I. JURISDICTION

Van Horne brings his claims under 42 U.S.C. § 1983 which provides the Court with subject-matter jurisdiction under 28 U.S.C. § 1331. Dkt. No. 1. Venue is proper in the

---

[1] *See Van Horne v. Valencia, et al.*, No. 1:21-cv-00173-H-BU (hereinafter, "*Valencia*"); *Van Horne v. Jones, et al.*, No. 1:23-cv-00017-H-BU (hereinafter, "*Jones*"); *Van Horne v. Dean, et al.*, No. 1:24-cv-00007-H-BU (hereinafter, "*Dean*").

1

Northern District of Texas, Abilene Division, because Van Horne's claims are predicated on events that occurred in Taylor County, Texas. 28 U.S.C. § 1391(b)(2). The undersigned has the authority to enter these Findings, Conclusions, and Recommendations (FCR) after the case was automatically referred to the undersigned for pretrial management under Special Order 3-251. *See also* 28 U.S.C. § 636(b)(1).

## II.  FACTUAL AND PROCEDURAL HISTORY[2]

### A.    Van Horne's IFP applications

Through four cases filed in this District, Van Horne has submitted seven applications for leave to proceed IFP.[3] In his first IFP application filed in this Court on February 2, 2023, Van Horne represented that he and his wife had a combined income of $3,900, of which $2,700 was attributable to Van Horne's two jobs as a minister and a daycare administrator. Dkt. No. 6 in *Jones*. One year later, in his IFP application here, he claims that he and his wife have a combined income of just $1,200, which consists solely of his wife's salary as the director of a private school. Dkt. No. 4 at 1–2. For his part, Van Horne represents that he has earned no income since filing his first IFP application despite maintaining the same two jobs identified in that earlier application. *Id.* at 1, 5. Van Horne attributes this significant drop in income to his taking a vow of poverty as part of his ministerial duties.[4] *Id.* at 5.

---

[2] The undersigned has omitted a rendition of the factual allegations in Van Horne's Complaint because they are not relevant to the truthfulness of his IFP application.

[3] *See* Dkt. No. 4; Dkt. No. 4 in *Dean*; Dkt. Nos. 4, 6, 16, 20 in *Jones*; Dkt. No. 25 in *Valencia*.

[4] The sincerity of Van Horne's religious beliefs and the practices of his religious societies are not questioned by the Court. But the Court should—indeed must—question the truthfulness of a litigant's claim to be

Currently, Van Horne lives with his wife and two of his adult children, whom he claims as dependents. *Id.* at 3, 5; *see also* Dkt. No. 8 at 43–44. He denies having a permanent residence, but he and his family receive free room and board at a property owned by his religious organization. Dkt. No. 4 at 5. As explained below, the property was purchased by Van Horne and his wife in 2000 and later turned over in trust to his religious organization. In addition to free room and board, Van Horne receives a $300 credit for utilities. *Id.*

Van Horne states that his household's monthly expenses currently total $1,150, which includes $900 for food, $75 for clothing and laundry, and $175 for transportation. *Id.* at 4. One year earlier, the household's expenses totaled $3,775. Dkt. No. 6 in *Jones*. Van Horne attributes the $2,625 drop in monthly expenses to a combination of mistakes he made in completing the IFP application, one of three adult children moving out, and the family's trimming of living expenses due to the vow of poverty.

### B.    Hearing testimony

Despite initial reservations about the accuracy of Van Horne's IFP application in this case, the Court erred in his favor and granted him leave to proceed IFP. But due to material inconsistencies in his various IFP applications, the Court set a hearing to delve further into Van Horne's IFP eligibility and the accuracy of his allegations of poverty. The following is taken from Van Horne's testimony at the hearing.

Van Horne and his wife are affiliated with a religious organization that operates a childcare center for younger children and a private school for older children (collectively,

---

indigent, particularly where, as here, the financial details of that claim are, at best, inconsistent as explained here.

the "schools") in the Wylie area.[5] Dkt. No. 8 at 7. Van Horne currently serves as the private school's Administrator while his wife serves as the Director of the childcare center. *Id.* at 25, 37, 62. They both have been instrumental in founding the schools and managing them since their inception.

Van Horne founded the childcare center in 2000. *Id.* at 21. Shortly afterwards, he founded the private school so that the children graduating from the childcare center would have a private school to attend. *Id.* at 36. The Van Hornes eventually established four day-care centers in the area, but the childcare center involved here, The Habitat, is the only one remaining. *Id.* at 24.

Van Horne testified that he and his wife purchased the property for the current lo-cation of the childcare center and private school in 2000 for over $300,000 and financed it themselves. *Id.* at 30. Within a few months of purchasing the real property, the Van Hornes placed it in trust for the benefit of their religious organization. *Id.* at 29, 31–34. The schools both sit on the Wylie property with the childcare center on the front of the property and the private school behind it. *Id.* at 7–8. This is the same property where Van Horne and his family receive free room and board. *Id.* at 46.

While the real property was placed in trust for the benefit of the religious society shortly after its purchase, the schools were not placed in trust until 2020. *Id.* at 40–41. Over the years, Van Horne has held several leadership positions at the schools. He managed the day-to-day operations of the childcare center—where his wife is currently employed as the

---

[5] The childcare center is called The Habitat for Learning and the private schools is called the AHFL School. For simplicity, the undersigned with refer to them simply as the childcare center and the private school.

Director—from its founding in 2000 until 2015. *Id.* at 21, 62. He is also one of the childcare center's four board members, a position he has held since 2015. *Id.* at 21–23. Each board member was, until recently, also an owner of the childcare center, including Van Horne. And he has held his current position as the Administrator of the private school for somewhere between 15 and 22 years. *Id.* at 19, 37–39.

The childcare center and private school currently enroll approximately 50 students each. *Id.* at 24, 37. The childcare center employees approximately 25 people and in 2018 paid out at least $235,000 in salaries. It has gross revenues of at least $300,000 per year. *Id.* at 25. The childcare center had total assets of at least $1.4 million as of 2018, which Van Horne does not appear to dispute. *Id.* at 63. For their leadership roles in these two schools, Van Horne testified that his wife receives $1,200 per month—she has not taken a vow of poverty—and he receives nothing other than free room-and-board plus a $300 per month utility credit due to his vow of poverty.

Van Horne did not take his vow of poverty until December 2022. *Id.* at 40–41. Prior to taking the vow, he earned $1,200 per month as Administrator of the private school and $1,500 as a minister, for a total monthly income of $2,700. *Id.* at 16. As for how these figures were arrived at or how they were allocated between the two jobs, Van Horne does not know. *Id.* at 18–19.

Pertaining to his previous stipend as the private school's Administrator, Van Horne testified that he does not know whom, within his society, set the Administrator's stipend at $1,200 per month, but acknowledged that his stipend was not capped by his society nor was a cap ever discussed except at the time he became a minister in 2020. *Id.* at 39, 43.

5

Van Horne insists that his circumstances meet the purposes of the IFP statute because "there are quite a bit of cases that I filed – and plan to file. There is no way that I could pay for all those at this time[.]" *Id.* at 65. He testified that he is "moving, sir, from an area that – that I'm spending money out here to an area where I won't be spending money" and that he seeks to move "from dealing with federal notes[.]" *Id.* at 71. Here, Van Horne seeks $22,500,000 in damages. *Id.* at 93.

### III.  LEGAL STANDARDS

Ordinarily, a plaintiff bringing a case in federal court must pay a filing fee, however, 28 U.S.C. § 1915 allows a plaintiff to seek court permission to proceed without paying any costs and fees, and this is known as proceeding *in forma pauperis*. Under the statute, a plaintiff looking to proceed IFP must file an affidavit attesting to their indigency. In that affidavit, the plaintiff must demonstrate that they cannot pay the costs of maintaining their case and still provide for their dependents. *Bright v. Hickman*, 96 F. Supp. 2d 572, 575 (E.D. Tex. 2000). Ultimately, though, whether to grant leave to proceed IFP rests in the sound discretion of the court. *See Startti v. United States*, 415 F.2d 1115, 1116 (5th Cir. 1969).

The IFP statute is "'intended to guarantee that no citizen shall be denied an opportunity to commence, prosecute, or defend an action, civil or criminal, in any court of the United States, solely because . . . poverty makes it impossible . . . to pay or secure the costs' of litigation." *Denton v. Hernandez,* 504 U.S. 25, 31 (1992) (quoting *Adkins v. E.I. DuPont de Nemours & Co.*, 335 U.S. 331, 342 (1948)). But in creating this door to the courts for indigent persons, Congress also recognized that a person who is allowed to file federal

lawsuits without cost, "'unlike a paying litigant, lacks an economic incentive to refrain from filing frivolous, malicious, or repetitive lawsuits.'" *Denton*, 504 U.S. at 31 (quoting *Neitzke v. Williams*, 490 U.S. 319, 324 (1989)).

As a check against abuse of the IFP privilege, Congress mandated that a case filed IFP be dismissed if the court determines either that the allegation of poverty is untrue, or the action advances claims that are frivolous or malicious, fail to state a claim upon which relief may be granted, or seek monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2); *see also Neitzke*, 490 U.S. at 324.

Crucially, then, even after a court grants IFP, the court retains the discretion to "revisit and reexamine" whether IFP has been improvidently granted. *Walker v. Jenkins*, No. 1:20CV197-HSO-RPM, 2023 WL 2446165, at *2 (S.D. Miss. Jan. 27, 2023), *report & rec. adopted*, 2023 WL 2186434; *see also Davis v. Hernandez*, No. 3:12–CV–2013–L–BN, 2016 WL 335442, at *2 (N.D. Tex. Jan. 5, 2016) (collecting cases), *report & rec. adopted sub nom.*, 2016 WL 320644; *Treff v. Galetka*, 74 F.3d 191, 197 (10th Cir. 1996) ("Leave to proceed [in forma pauperis] is a privilege, not a right[,] courts have the discretion to revoke that privilege when it no longer serves its goals") (citation omitted).

But if a court determines that a plaintiff's allegation of poverty is untrue, there is no discretion, and a court must dismiss the plaintiff's case. 28 U.S.C. § 1915(e)(2)(A) (requiring that a court dismiss a case "at any time" if it determines that "the allegation of poverty is untrue"); *see also Gill v. Bennett*, No. 4:17-CV-00611-O-BP, 2018 WL 3275494, at *2 (N.D. Tex. Jan. 16, 2018) ("Dismissal is mandatory rather than permissive under this statute.") (citing *Castillo v. Blanco*, 330 F. App'x 463, 466 (5th Cir. 2009) (per curiam)), *report*

7

*& rec. adopted*, 2018 WL 1663287. This dismissal may be with or without prejudice, although dismissal with prejudice is reserved for those instances where "'evidence exists of bad faith, manipulative tactics, or litigiousness.'" *Castillo*, 330 F. App'x at 466, (quoting *Lay v. Justices-Middle Dist. Ct.*, 811 F.2d 285, 286 (5th Cir. 1987)).

Regarding § 1915(e)(2)(A)'s use of "untrue," the Seventh Circuit has said that, "Congress meant something like 'dishonest' or 'false,' rather than simply 'inaccurate.'" *Robertson v. French*, 949 F.3d 347, 351 (7th Cir. 2020). While the purpose of § 1915(e)(2)(A) is ultimately to "weed out" the litigants who could pay the filing fee but purposely understate their net worth, *see Lee v. McDonald's Corp.*, 231 F.3d 456, 459 (8th Cir. 2000), "a misrepresentation on an IFP application form is enough to support dismissal of the case." *Robertson*, 949 F.3d at 350. Further, a plaintiff's misrepresentation may warrant dismissal even where the plaintiff would be still entitled to IFP had they told the truth in the first instance. *See Kennedy v. Huibregtse*, 831 F.3d 441, 443 (7th Cir. 2016) ("Although the district judge might have granted the plaintiff's in forma pauperis petition even if he'd disclosed his separate trust account, hiding assets is not a permissible alternative to seeking the judge's assistance.").

## IV. ANALYSIS

Having now heard Van Horne's testimony and carefully considered his various IFP applications in the context of that testimony, the undersigned finds that Van Horne's allegation of poverty is untrue and that his payment of a filing fee would not prevent him from providing for himself and his family.

Van Horne's testimony compels the conclusion that he and his wife continue to operate the childcare center and private school—which includes, at least for Van Horne, the authority to set salaries—notwithstanding his representation that he has turned these entities over to his religious society. The childcare center, run by Van Horne's wife, provides care for 50 children, has a staff of 25, earns annual revenues of over $300,000, disburses an annual payroll of nearly a quarter of a million dollars, and consists of assets valued at least at $1.4 million. Dkt. No. 8 at 24–25, 37. And yet, Van Horne testified that his wife, who has not taken a vow of poverty, is paid only $1,200 per month as the center's Director, which works out to be $7.50 per hour, assuming she works a 40-hour week. *Id.* at 6, 55–56, 62.

In contrast, as the Administrator of the adjacent and affiliated private school, Van Horne sets teacher salaries at up to $10 per hour, depending on experience. *Id.* at 38–39. It is undisputed that Van Horne's wife is very experienced. She was a co-founder of the daycare center and appears to have continuously served in a leadership role there for more than 20 years, yet she is paid only $1,200 per month. To illustrate why this matters here, if Van Horne's wife earned only $1.00 more per hour, or $8.50, that increase alone would cover up to three or four filing fees per year. It is simply not credible for Van Horne to suggest that a $1.00 per hour increase is either not within his authority or not well-deserved by his wife.[6] Truly indigent persons do not have similar influence over their household's income.

---

[6] Lending further doubt to the accuracy of his wife's income, Van Horne states in his IFP application here that she works at the "AHFL Private School," not the childcare center. Dkt. No. 4 at 2. It is the private school where Van Horne, as Administrator has authority to set salaries up to $10.00 per hour.

Until recently, Van Horne received an income—he describes it as a "stipend"—for at least $2,700 per month from the private school and the Kingdom. Dkt. No. 8 at 18–21. As for how these figures were arrived at or how they were allocated between the two jobs, Van Horne either does not know or will not explain. *Id.* at 18–19. But he claims that until January 2023, he and his wife had a combined monthly income of $3,900. *See id.* at 20–21. When he became a minister in 2020, Van Horne claims that an elder—whose last name he does not know—told him that he would not receive any additional compensation for his work as a minister but that he would continue to receive his monthly "stipend" of $2,700. *Id.* at 15–16. Then, in December 2022, Van Horne volunteered to take a vow of poverty and gave up his stipend beginning in January 2023. *Id.* at 40–42.

It is not necessary here for the Court to question Van Horne's vow of poverty to conclude that he can afford to pay the filing fee. After all, his income is only one variable in determining eligibility to proceed IFP. But even accepting the vow of poverty as true, the undersigned still finds that Van Horne has been less than forthright regarding the finances of his family and the schools, as well as his involvement in the schools and their finances.[7]

For instance, Van Horne's significant involvement with the schools since their inception is incongruous with his professed lack of knowledge about the schools' operations.

---

[7] Van Horne admitted that he was previously deceptive with the elders in his religion in connection with the finances of the daycare center, and that set of circumstances resulted in he and his wife being successfully sued in federal court and ordered to pay a former employee back wages, liquidated damages, attorney fees, and costs. *See* Dkt. No. 8 at 64–66; *see also Biziko v. Van Horne, et al.*, Civil Action No. 1:16-CV-00111-C. There is precedent, then, for Van Horne's lack of forthrightness with the childcare center's finances.

This appeared not only in his inability to estimate the childcare center's expenses despite being one of only four board members and, until recently, an owner, but other details as well. When asked who owned the childcare center when he started it, Van Horne initially claimed that he is "not even sure what the ownership situation would [have been]" at that time. Dkt. No. 8 at 26–28. He testified that, "I'm not sure how that goes in business . . . [b]ut from what I believe, a board would pretty much be the ones who – who owns it." *Id.* Upon further questioning, Van Horne admitted that the childcare center was owned by himself and the three other board members until 2020 when it was placed in trust for the benefit of his religious society. *Id.* at 23, 26–28. But it appears that Van Horne controlled the assets of the schools from their founding until they were placed in trust in 2020, and possibly thereafter, as explained below. *Id.* at 8, 25–26, 31.

Further inconsistencies appear in connection with the value of the real property purchased by Van Horne and his wife for the schools' location. The Van Hornes purchased the Wylie property in 2000 and it has since been paid off using revenues from the schools' operations. *Id.* at 26–28, 34. Van Horne was asked about the property's current value, and he testified, "I haven't looked[.]"[8] *Id.* at 28. It strains credulity to suggest that the founder and long-time administrator and board member of two relatively small schools would be oblivious to the value of the schools' property that he originally purchased and actively managed for decades.

---

[8] When the undersigned suggested based on publicly available information that the property was valued at approximately $1.5 million, Van Horne did not dispute this. Dkt. No. 8 at 29, 31.

There is also a disconnect between Van Horne's placement of the schools and real property in trust and his continued control over each. For instance, notwithstanding the trust, Van Horne acknowledged that he "was still the administrator, making decisions," and "at the same time [of the trust] I was – I had control over that because they kind of left me in control of that." *Id.* at 32–33. Although Van Horne placed the properties in trust and remained heavily involved in the administration and management of the trust's assets, when asked to identify the trustees of the trust Van Horne struggled to recall. He initially identified one person, and possibly another, but ultimately said, "I don't remember who all are in the – I don't know who's all in there. I don't recall that." *Id.* at 34.

Additionally, Van Horne testified that he does not know the tuition at the private school where he has served as Administrator for two decades. *Id.* at 36–38. But he acknowledged that those who make that decision work in the school, presumably under him. *Id.* Tellingly, Van Horne has the authority to set the salaries of the school employees:

| | |
|---|---|
| **Court**: | So how long have you been administrator at the private school? |
| **Van Horne**: | It's been a while. It's been a long -- I want to say -- I would have to look at that because I usually get the information -- I usually look it up and -- and put it down, and I don't really keep that --- |
| **Court**: | Well, just a ballpark. 5, 10, 15, 20 years? |
| **Van Horne**: | At least 15 years I would say. |
| **Court**: | Okay. So as administrator, that certainly implies that you have a financial role in the school. |
| **Van Horne**: | A financial role? |
| **Court**: | Yeah. I mean "administrator" implies that you, you know, administer, among other things, the budget of the school, the finances of the school, that type of thing. |
| **Van Horne**: | So when you say "finances of the school," that means that I would --- |
| **Court**: | Expenses, income, salaries. |

| | |
|---|---|
| **Van Horne**: | Okay. I'm not – I'm not sure if I understand you. If that means that I personally would have a part in that, putting that out, no, I do not have that. However, as far as decisions are made to say, "Okay, does this one," you know, how much someone would get paid or what they would start at, if those -- you know, if those decisions had been given to me, yeah, I would say, "Okay, this person could do this." You know, they could get paid, starting salary, at seven or ten dollars or whatever the case is. |
| **Court**: | You're the one that makes that decision, right? |
| **Van Horne**: | That decision was given -- That -- That authority was given to me, yes. |
| **Court**: | The authority to set salaries and things like that. |
| **Van Horne**: | Within a certain range. |
| **Court**: | All right. Well, what was the range for a teacher? |
| **Van Horne**: | $7.25 -- |
| **Court**: | Okay. |
| **Van  Horne**: | -- to 10 dollars based upon experiences. |

*Id.* at 38–39.

Also during the hearing, the undersigned addressed discrepancies in Van Horne's assets as reported in his various IFP applications. *See id.* at 57–61. For instance, Van Horne was asked if he owned any personal vehicles, and he replied, "Not anymore." *Id.* at 57. He was asked whether he had a vehicle registered in his name, and he replied, "I don't have a vehicle, personal vehicle anymore." *Id.* He was asked again whether he had a vehicle registered in his name, and he replied, "No, sir." *Id.* at 58. Once more, he was asked whether he owned a vehicle, and he finally replied, "I have one." *Id.*

Van Horne was then asked whether his wife had a vehicle, and the following colloquy took place:

| | |
|---|---|
| **Van Horne**: | No, she doesn't. |
| **Court**: | Are you sure? |
| **Van Horne**: | As far as I know. |
| **Court**: | You would know, wouldn't you? |

| | |
|---|---|
| **Van Horne** | : Not necessarily. |
| **Court** | : Why wouldn't you know what your -- whether your wife has a vehicle? |
| **Van Horne** | : Does she drive a vehicle? Does she own a vehicle? That's two different things. |
| **Court** | : Does she own a vehicle? |
| **Van Horne** | : Not that I know of. |
| **Court** | : You don't know whether your wife owns a vehicle? |
| **Van Horne** | : I don't -- I don't think she owns a vehicle. She drives a vehicle that belongs to the society but she doesn't own it. |
| **Court** | : Under oath, you can't tell me whether your wife owns a vehicle? |
| **Van Horne** | :  I could tell you if she drives a vehicle. The owner of that vehicle, I could not tell you. I may tell you that it's not hers and -- and it may be hers, but she hasn't told me that. |

*Id.* at 58–59.

Van Horne's explanations regarding his family's monthly expenses are similarly opaque. As explained above, he states in the IFP application here that his household's monthly expenses currently total $1,150, which includes $900 for food, $75 for clothing and laundry, and $175 for transportation. This comes out to be $7.50 in food for each adult family member per day. One year earlier, the household's expenses totaled $3,775, and the daily food portion of that for each adult was almost $17. Dkt. No. 6 in *Jones*. Van Horne attributes the $2,625 drop in monthly expenses to a combination of mistakes he made in completing the IFP application, one of three adult children moving out, and the family's trimming of living expenses due to the vow of poverty.

But a review of Van Horne's IFP applications leads to several observations that he could not adequately explain. As for how his household expenses dropped from nearly $4,000 per month to just $1,150 in four months, *see* Dkt. No. 8 at 44–54, Van Horne initially claimed that he must have filled out the form incorrectly. *Id.* at 48. But a review of

14

one of Van Horne's indigency applications in state court shows that his expenses in August 2021 are remarkably similar to his expenses listed in February 2023.

|  | Dkt. No. 1-4 in *Valencia* (filed 8/16/2021) | Dkt. No. 6 in *Jones* (filed 2/2/2023) |
|---|---|---|
| Food/Household Supplies | $2,500 | $2,000 |
| Home Mainte-nance | — | $500 |
| Utilities/Telephone | $750 | $675 |
| Clothing/Laundry | $250 | $250 |
| Transportation | $350 | $350 |
| **Total** | **$3,850** | **$3,775** |

This similarity belies Van Horne's suggestion that the sudden drop in expenses was the product of an error in completing the IFP application.

In the end though, Van Horne claims that he has been able to trim his expenses by cutting back. Along these lines, he claimed that the reduction in his monthly grocery bill ($1,100) is largely due to one of his three adult children moving out. Dkt. No. 8 at 52. But Van Horne claimed that adult son as a dependent in his June 2023 IFP application—the same application where he told the Court that his grocery expenses had been reduced to $900. Dkt. No. 16 at 3 in *Jones*.

Van Horne was asked what mode of payment he and his wife use when purchasing their groceries and other shopping. *Id.* at 59. He replied that he uses two credit cards that were issued to him long ago, but he does not know how many cards he has in total. *Id.* When asked what his credit limits were on each card, he described them as "quite

substantial." *Id.* at 60–61. When asked how much income he reports to the credit card companies to maintain such a high limit, he testified that he does not answer the credit card companies' requests to update his income because if he did, "they would not give me a card." *Id.* at 62. When asked if he thought that was honest, he replied, "It's not being dishonest. I'm just not answering. My 'yes' is my 'yes,' My 'no' is my 'no.' I just don't answer." *Id.* at 61.

Also puzzling is Van Horne's representation that he once spent $500 a month in home maintenance that is no longer an expense. Van Horne has been adamant that he does not own a home or have a permanent residence. Dkt. No. 8 at 43–44. When asked what expenses fell under home maintenance, he could not answer. *Id.* at 47. Further, Van Horne would not provide a clear answer regarding what his $300 utility credit covers when he has no permanent residence and does not list anything fairly characterized as a utility in his most recent application. *See id.* at 44–46.

Ultimately, Van Horne struggled to explain the dramatic reduction in his expenses. This matters because once Van Horne claimed that his family's income dropped by $2,700 per month, he could not continue to claim that his expenses remained at almost $4,000. Again, free room-and-board does not help in this explanation because the Van Hornes did not pay rent even before the vow of poverty when the household expenses were almost $4,000. *See* Dkt. No. 6 at 4 in *Jones*. There were no expenses that could be categorized under the rubric of room-and-board in his pre-vow expenses. Something had to give.

Again, questioning the sincerity of Van Horne's vow is unnecessary in resolving this riddle. Accepting his vow at face value, the family had to receive help from somewhere to

meet their expenses, and that help came from Van Horne's religious organization. In other words, after his vow, Van Horne's religious organization began paying expenses above and beyond traditional notions of room-and-board. And there is nothing wrong with that. The problem arises only when Van Horne misrepresents that arrangement to the Court and then offers strained explanations for how he reduced his family's expenses rather than have his society cover them.

The undersigned's resolution of the tension between Van Horne's reported income and expenses is confirmed by Van Horne's testimony. When asked why he includes food as an expense when his society provides free room-and-board, Van Horne conceded that room-and-board traditionally includes food:

**Court**:        "Free room and board" is a place to stay and food to eat.
**Van Horne**: Well, ---
**Court**:        I'm not trying to get cute with you here. That's just the common understanding of what "free room and board" means. If I offer someone free room and board and they come to my house and I don't feed them, they're going to be upset.
**Van Horne**: Probably so, Your Honor.

***

**Van Horne**: So my salary went out. And whatever I was receiving, the stipend, yes, [the religious society] picked up on a lot of that, but they didn't pick up on everything . . . .

***

**Van Horne**: Did the society pick up on a lot of things that I – my income was dealing with? Yes, because they had to because it's not there anymore. Or if they ask me to do something and then whatever I was doing, I -- I won't be able to function, they would have to step in somewhere to -- to help us to function.
**Court**:        And they've done that.
**Van Horne**: They have -- They have. Yes, they did.

17

Dkt. No. 8 at 53–54. Thus, it appears that Van Horne and his society have a very elastic view of room-and-board which, in this case, renders the expense allegations in Van Horne's IFP application untrue.

The IFP application in federal courts, including the ones signed by Van Horne, include an affidavit that reads in part: "I declare under penalty of perjury that the information below is true and understand that a false statement may result in a dismissal of my claims." *See e.g.*, Dkt. No. 4 at 1. "One who makes this affidavit exposes himself 'to the pains of perjury in a case of bad faith' . . . This constitutes a sanction important in protection of the public against a false or fraudulent invocation of the statute's benefits." *Adkins*, 335 U.S. at 338 (quoting *Pothier v. Rodman*, 261 U.S. 307, 309 (1923)). "The perjury sanction thus serves to protect the public against misuse of public funds by a litigant with adequate funds of his own, and against the filing of 'frivolous or malicious' lawsuits funded from the public purse." *Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 198–201 (1993) (citing 28 U.S.C. §§ 1915(a), 1915(d)).

With these principles in mind, the undersigned considers Van Horne's litigation. In *Valencia*, now dismissed, Van Horne sued three Texas State Troopers in connection with a traffic stop where he insisted that the State's driver license's requirement was unconstitutional, and that he had an absolute right to drive on the roads of Texas without a license. *See* Dkt. No. 1 in *Valencia*. While the undersigned's FCR recommending dismissal of that action was pending, Van Horne filed *Jones*, claiming that a different set of public officials, this time those associated with state court, violated his rights for prosecuting him for

18

driving without a license. *See* Dkt. No. 1 in *Jones*. And within 8 months of that case being dismissed by this Court, Van Horne filed two cases in quick succession, the instant case and *Dean*. These most recent cases similarly have their genesis in a duly authorized Texas peace officer having the audacity to issue Van Horne a traffic citation for not having a driver's license. *See* Dkt. No. 1; Dkt. No. 1 in *Dean*.

When Van Horne insists that he meets the purposes of the IFP statute because "there are quite a bit of cases that I filed – and plan to file" and that "[t]here is no way that I could pay for all those at this time[,]" these are the cases he is referring to. *Id.* at 65. And he intends to file more lawsuits along the same lines. Thus, it is not Van Horne's indigency that prevents him from paying the filing fee, it is the number of lawsuits he insists on filing despite this Court telling him that his theories are frivolous.

But the serial filing of lawsuits, particularly those indisputably without a legal basis, was never the situation the IFP statute was intended to address. As explained above, the IFP statue was not intended to incentivize the filing of multiple frivolous lawsuits. *Denton*, 504 U.S. at 31. One purpose of the filing fee is to cause potential litigants to pause and genuinely consider whether their claim has merit before incurring the fee. Here, despite this Court making clear that Van Horne's legal premise that he is not subject to state law is meritless, he remains undeterred and plans to fight on, at the public's expense. As the Supreme Court has observed: "We know of few more appropriate occasions for use of a court's discretion than one in which a litigant, asking that the public pay costs of his litigation, either carelessly or wilfully and stubbornly endeavors to saddle the public with wholly uncalled-for expense." *Adkins*, 335 U.S. at 337.

Each of Van Horne's lawsuits to date appear to share a common quixotic and misguided mission to establish that Texas's motor vehicle laws do not apply to him. But Van Horne's claim that he cannot afford to pay the filing fee in this case must be seen for what it is: an effort to shoulder the public with paying the filing fees in a series of cases, each of which thus far rests on indisputably meritless contentions. The Court should neither aid him in that pursuit nor tolerate his filing of dubious claims of indigency.

The undersigned wishes to reemphasize what was said at the hearing: None of the observations above are meant to cast aspersions on Van Horne's faith and the sincerity of his beliefs. Rather, it is Van Horne's omissions, questionable representations, and unpersuasive explanations the undersigned focuses on here.

## V. FINDINGS OF FACT

After careful consideration of Van Horne's IFP application, his testimony at the hearing of January 10, 2024, and his demeanor at that hearing, the undersigned makes the following findings based on a preponderance of the evidence:

A.    Van Horne's IFP allegations concerning the property owned by him and his wife, and the value of that property, are untrue.

B.    Van Horne's IFP allegations concerning the average monthly expenses of he and his wife are untrue.

C.    Van Horne's allegations concerning the scope of expenses that are paid for by his society, and that he receives no gifts beyond room, board, and a $300 utility credit, are untrue.

20

D.  Van Horne's allegations concerning his knowledge and involvement in the finances of the childcare center and private school are untrue.

E.  Van Horne's allegation that he has no legal residence is untrue.

F.  Van Horne's January 10 testimony was evasive and untrue in several material respects pertaining to his financial ability to pay this Court's filing fees while still providing for his family.

The undersigned stops short of finding untrue Van Horne's allegation that his wife earns only $1,200 per month as the Director of the childcare center. But it is clear to the undersigned, based again on a preponderance, that Van Horne has the authority or other influence to increase his wife's salary, but chooses not to for reasons that remain unexplained. These reasons likely include qualifying for IFP status in state and federal court.

## VI.  RECOMMENDATIONS AND CONCLUSIONS

For the reasons explained above, the undersigned recommends the Court dismiss this action under § 1915(e)(2)(A). If the Court adopts this recommendation, the undersigned also finds that Van Horne's omissions and evasive answers constitute bad faith, manipulative tactics, or litigiousness such that the dismissal should be with prejudice. In the alternative, the undersigned recommends that the Court revoke Van Horne's IFP status and require him to pay the $402 filing fee within a reasonable time.[9]

---

[9] Van Horne filed an identical IFP application to the one here in *Dean*. *See* Dkt. No. 4 in that case. The findings and recommendations above apply equally to Van Horne's allegations in that case. Thus, the undersigned will enter a separate FCR in *Dean* recommending dismissal of that case on the same basis as here.

## VII. RIGHT TO OBJECT

A copy of these Findings, Conclusions, and Recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these Findings, Conclusions, and Recommendations must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendations where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

ORDERED this 18th day of April 2024.

JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE